In the Matter of Proving the Last Will and Testament of LAURA
GUIDI, Deceased.*

ALEXANDER F. WHELAN, Proponent, Appellant; MARGARET TAYLOR
MOUNTAIN and JAMES PERCY MOUNTAIN, Contestants,
Respondents.

First Department, May 31, 1940.

*Laurence L. Cassidy* of counsel [*Mortimer M. Cassidy* with him
on the brief; *Cassidy & Cassidy*, attorneys], for the appellant.

*Colley E. Williams* of counsel [*William G. Chambers* with him on
the brief; *Whitman, Ransom, Coulson & Goetz*, attorneys], for the
respondents.

UNTERMYER, J. This is a contested proceeding for the probate
of a paper dated February 2, 1939, as the last will and testament

---

* Revg. 173 Misc. 740.

of Laura Guidi, deceased. Mrs. Guidi died a resident of New York county on June 17, 1939. The proponent, Alexander F. Whelan, a member of the bar, is designated as executor and would receive almost all of the decedent's estate, amounting to about $25,000. The contestants, Margaret Taylor Mountain and James Percy Mountain, are the decedent's aunt and cousin, respectively, and her next of kin. They filed objections to the probate, all of which were dismissed by the surrogate at the conclusion of the contestants' evidence, with the exception of that which alleged that the will was not the free and unconstrained act of the decedent. The surrogate found that there had been formal compliance with the statutory requirements as to execution and that there was no lack of testamentary capacity, but thereafter found that the instrument was the result of undue influence exercised by the proponent over the deceased, and accordingly denied probate.

The decedent was about fifty-four years of age at the time of death. She had been a widow for several years and had no children. Her nearest relatives resided in Massachusetts. She had not seen her " Aunt Margaret " Mountain for more than thirty years, nor her " Cousin Percy " Mountain, the other contestant, for twenty years except on one occasion in 1938. She had lived abroad with her husband for many years, and following his death had returned to the United States in 1934. For one year thereafter she lived in Philadelphia and then took residence in New York city. Her first address was at 166 East Thirty-fourth street and then, from October 1, 1937, to the time of her death, at 55 West Eleventh street. At both apartments she lived alone.

The decedent's mother, Jane Fitch, died on November 8, 1936, and her stepfather, Herbert Fitch, on May 9, 1937. It was on the occasion of his funeral that she met Whelan. He was introduced to the decedent by Edwin J. Wallace, the undertaker. She engaged him as her attorney in the administration of her stepfather's estate, of which she was the executrix, and in administration proceedings de bonis non of her mother's estate.

Whelan was admitted to the bar in 1932. Previously he had served as a clerk in the office of Joseph A. Modr, an attorney. After admission to the bar Modr allowed him the limited use of his office and telephone number without charge. Whelan had a similar arrangement with another attorney in Long Island City. Most of Whelan's consultations in connection with legal services rendered to the deceased were at her home. Throughout their acquaintance, he visited the decedent about once each week until her last illness, when his visits became more frequent.

The net estate of Mr. Fitch amounted to about $32,000 and consisted principally of bonds of the Dominion of Canada. At the decedent's request, these bonds were sold by Whelan and the proceeds deposited in various savings bank accounts in her name. About March 21, 1938, one of these accounts was changed to a joint savings bank account in the name of the decedent and Whelan, which at the time of her death amounted to $6,958.66. The bank books continued in the decedent's possession except when Whelan presented them at the banks for computation of interest. He also received some occasional small gifts from the decedent and in connection with Christmas of 1937 was given the sum of $2,000 in cash.

On August 27, 1937, the deceased executed a will, prepared by Whelan and witnessed by him and Modr, his former employer, in which she bequeathed her entire estate to her cousin, the contestant, James Percy Mountain. It also appears that during the time Whelan acted as her attorney she corresponded with the contestants in terms which indicate sentiments of affection for them. In May, 1938, she gave James Percy Mountain $2,000, one-half of which he used to open a margin account with a brokerage firm in Boston. In January, 1939, he wrote to the decedent admitting that fact and asking for an additional sum of money to meet a margin call.

Although prematurely old in appearance and afflicted with almost total deafness, the deceased was not entirely a recluse, nor without some outside contacts and associations. She personally visited the savings banks and the storekeepers in the neighborhood. On various occasions she dined with the telephone operator at the apartment where she resided at Eleventh street. She met Virginia Mountain, a daughter of Percy Mountain, at the dock of the Eastern Steamship Lines in New York in the spring of 1938. However, the principal visitors at the decedent's apartment were Whelan and his wife, for both of whom she appears to have developed a sincere affection. Because she lived alone and the Whelans were so frequently in her company, the respondents assert that Whelan was afforded the opportunity of gaining control over the decedent, acquiring a large part of her property even before her death, and finally inducing her to change the disposition of her estate as contained in the will of 1937.

On February 1, 1939, Whelan telephoned to Modr who had previously met the deceased, informing him that she desired to make a new will, which he preferred not to prepare because it would contain provisions of benefit to him. On February 2, 1939, the will was executed. On that day the deceased called on Modr and stated that she was consulting him because she had known him for

some time.  She spoke of a desire to make a new will, as to the contents of which Modr made notes which were received in evidence at the trial.  Specifically she stated that she had previously given James Percy Mountain, the principal beneficiary in her existing will, " an out-and-outright gift of $2,000 and subsequently found out that he was using that money for stock market speculations;" that he had written requesting additional funds for the same purpose, and that although she intended to comply she would leave her estate to Whelan who had always been cordial and considerate to her, and " was the only person who cared about her and who did anything for her in any shape, form or manner."

Modr then personally prepared and typed the will.  He showed it to Mrs. Guidi, who read it and said: " That suits me perfectly." It was witnessed by Modr and one Hugo Kraus, a neighboring real estate agent.  After execution, the will was delivered to the decedent.  Modr sent a bill for his services which was paid by check of the decedent.  Whelan was not present at any time during the preparation or execution of the will.

The respondents contend that there are many circumstances which justified the surrogate in denying probate.  These are described as consisting of the confidential relationship of attorney and client which existed between the beneficiary and the decedent; that the alleged will was procured by the fiduciary who arranged for its preparation and execution; the disposition of the entire estate to the fiduciary, with the exception of a bequest of jewelry to his wife, neither of whom was related to the decedent by blood or marriage; the circumstance that this fiduciary acquired property from the deceased during her lifetime without consideration; the change of testamentary disposition; the incorrect recitals in the will that the testatrix makes no provision for her cousin Percy and her aunt Margaret because " she had amply provided for them during my lifetime and have only seen or heard from them once or twice in the past thirty years; " the inexperience of the decedent in business affairs; and, lastly, that no relative or disinterested person was consulted in connection with the preparation or execution of the alleged will or any of the transactions by which the fiduciary acquired property of the client.  It is argued that all these facts in combination sustain the finding that the alleged will was obtained by undue influence exerted on the decedent.

In concluding that the alleged will was the result of undue influence, the surrogate relied heavily on the doctrine that undue influence will be presumed to exist where an attorney prepares and causes to be executed a will in which he is the beneficiary.  (*Matter of Kindberg*, 207 N. Y. 220, 228; *Matter of Smith*, 95 id. 516, 523;

*Marx* v. *McGlynn,* 88 id. 357, 371; *Matter of Lamerdin,* 250 App. Div. 133, 135; *Matter of Rintelen,* 77 id. 142, 147.) That presumption has never, we think, been applied where an attorney has recommended to his client another attorney with whose independent advice the will was prepared. Indeed, the language of the Court of Appeals in *Matter of Putnam* (257 N. Y. 140, 143) that " Attorneys for clients who intend to leave them or their families a bequest would do well to have the will drawn by some other lawyer," and that " any suspicion which may arise of improper influence used under the cover of the confidential relationship may thus be avoided," precludes the application of such a presumption in the present case. We find nothing in the relationship between Whelan and Modr to suggest that Modr did not give to the deceased the benefit of disinterested advice.

The disposition by the testatrix of her property is readily accounted for by the friendship which developed with the proponent and his wife during a period of almost two years, coupled with the long separation from her relatives in Boston and the speculations of James Percy Mountain which influenced the testatrix to change the earlier testamentary dispositions. The concern which appears to have been manifested by Whelan for the welfare of the testatrix should not be confused with undue unfluence. Acts of kindness and consideration · evoking reciprocal sentiments of gratitude and affection do not constitute undue influence. These sentiments on the part of this widowed and childless lady who had been befriended by this younger couple account, we are convinced, for the gifts made to them in her lifetime and the disposition intended to take effect at her death. We are accordingly of the opinion that the finding that the paper propounded as the will of the deceased was secured by undue influence is against the weight of the evidence.

The objections to the probate should be dismissed, the decree reversed, with costs, and the will of February 2, 1939, admitted to probate.

MARTIN, P. J., O'MALLEY, GLENNON and DORE, JJ., concur.

Decree unanimously reversed, with costs.